UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- X

ESE A. O'DIAH,   :
  :
           Plaintiff,   :
  :
     - against -   :
  :
  :
TBTA-TRIBOROUGH BRIDGE AND   :
TUNNEL AUTHORITY,   :
  :
           Defendant.   :
  :

------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __6/23/2021__

19-CV-7586 (VSB)

**OPINION & ORDER**

Appearances:

Ese A. O'Diah
Briarwood, NY
*Pro se Plaintiff*

Esteban Morales
Matthew Joseph Novian
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
Los Angeles, CA

Todd Fredrick Rosenbaum
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
New York, NY
*Counsel for Defendant*

VERNON S. BRODERICK, United States District Judge:

Before me is Defendant TBTA-Triborough Bridge and Tunnel Authority's ("TBTA" or

"Defendant") motion to dismiss pro se Plaintiff Ese A. O'Diah's ("O'Diah" or "Plaintiff")

Amended Complaint.  (Doc. 20.)  For the reasons stated below, the motion to dismiss is

GRANTED IN PART and DENIED IN PART.  Specifically, because I find that I have

jurisdiction and that Plaintiff has stated a claim with respect to his federal and state excessive

fines claims and his unjust enrichment claim, Defendant's motion to dismiss is DENIED as to

these claims. However, TBTA's motion to dismiss is GRANTED as to all other claims.

## I.   <u>Factual Background</u>[1]

Plaintiff Ese A. O'Diah is a resident of Queens County, New York and is a contracted

driver[2] who makes use of certain bridges and tunnels with tolling systems operated by

Defendant. (Am. Compl. ¶¶ 12–13, 31.) In January 2017, TBTA switched many of its bridges

and tunnels to a "cashless toll" collection system, meaning that tolls are now collected from

drivers using automated systems. (*Id.* ¶ 3.) These systems include the "EZPass" system, and the

"Toll-By-Mail" ("TBM") system. (*Id.* ¶ 16.) As cars pass through the cashless tolls, cars with

EZPass transponders are detected by the cashless toll system, and automatically charged through

EZPass accounts. (*Id.* ¶ 17.) Through TBM, cars without EZPass transponders are imaged by

the cashless toll system and a bill is sent by mail to the registered owner of the car using the

license plate registration information. (*Id.* ¶ 18.)

Before a toll bill is sent to a motorist, it takes TBTA approximately thirty days to prepare

the bill statement for distribution through TBM. (*Id.* ¶ 22.) When a motorist receives the TBM

statement, the motorist has thirty days to pay the toll bill. (*Id.* ¶ 23.) If a motorist fails to pay the

---

[1] The facts set forth in this section are derived from Plaintiff's Complaint, ("Compl."), (Doc. 2), as well as Plaintiff's Amended Complaint ("Am. Compl."), (Doc. 16). *See Voltaire v. Westchester Cty. Dep't of Soc. Servs.*, No. 11-CV-8876 (CS), 2016 WL 4540837, at *3 (S.D.N.Y. Aug. 29, 2016) ("[A] court is permitted to consider factual allegations in pro se plaintiffs' preceding complaints in order to supplement these in amended complaints."). Additionally, I consider the factual allegations in Plaintiff's opposition papers to the extent they are consistent with Plaintiff's pleadings, and also consider the exhibits submitted by Plaintiff in support of his opposition papers. (Doc. 31.) *See Walker v. Schult*, 717 F.3d 119, 122 n.1 (2d Cir. 2013) ("A district court deciding a motion to dismiss may consider factual allegations made by a pro se party in his papers opposing the motion."). Lastly, I consider Exhibit 1 to the Bressler Declaration, (Doc. 21-1), which includes the Tolls By Mail bills owed by Plaintiff, which are integral to Plaintiff's Amended Complaint. *See Cohen v. Rosicki, Rosicki & Assocs., P.C.*, 897 F.3d 75, 80 (2d Cir. 2018) ("A complaint is . . . deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint.") (internal quotation marks omitted). I assume these factual allegations to be true for purposes of this motion. *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). My references to these allegations should not be construed as a finding as to their veracity, and I make no such findings.

[2] Neither Plaintiff's Complaint nor his Amended Complaint define the term "contracted driver."

toll bill within thirty days, a notice of violation[3] letter is sent to the motorist notifying the

motorist that the toll bill must be paid within thirty additional days to avoid incurring the

violation fees included in the letter.  (*Id.* ¶ 24.)  After sixty days without payment, an

Enforcement Action[4] letter is mailed to the motorist assessing both the underlying toll bill and

the violations fees associated with the unpaid bill.  (*Id.* ¶ 25.)  Violations fees are assessed in

amounts of either $50 or $100 per unpaid toll bill.  (*Id.*)[5]  If a motorist fails to pay their toll bill

and violation fees within thirty days of the Enforcement Action letter, the statement goes to

collection.  (*Id.* ¶ 26.)

Before a motorist receives a TBM bill, the motorist has the option to view their current

account balance through a website.  (*Id.* ¶ 27.)  It takes thirty days from the date on which the toll

was incurred for the website to reflect the outstanding toll balance.  (*Id.* ¶ 28.)  To access the

TBM account statement online, a motorist needs to input their license plate and toll bill number.

(*Id.* ¶ 29.)

Plaintiff had used the New York toll system without issue prior to the implementation of

the cashless system in 2017.  (*Id.* ¶ 31.)  After introduction of the cashless toll systems, Plaintiff

set up an EZPass account, but often passed through tolls without his transponder, resulting in

---

[3] These violation letters appear to be titled "Notice of Violation Enforcement Impending Collection / Legal Action". (Bressler Decl. Ex. 1, Doc. 21-1.)

[4] These enforcement action letters appear to be titled "Notice of Violation Enforcement Action."  (Bressler Decl. Ex. 1, Doc. 21-1)

[5] New York's Toll Violation Enforcement codes states the following:

> The owner of any vehicle which violates toll collection regulations by crossing a bridge or tunnel without paying the crossing charge prescribed by the Authority at the place and time and in the manner established for the collection of such crossing charge shall be liable to the Authority for an administrative fee, known as the toll violation fee. The fee shall be in the amount of $50.00, for each such violation arising from crossing the Henry Hudson Bridge, the Cross Bay Veterans Memorial Bridge and the Marine Parkway-Gil Hodges Memorial Bridge; and, $100.00 for each such violation arising from crossing the Bronx-Whitestone Bridge, the Hugh L. Carey Tunnel, the Queens Midtown Tunnel, the Robert F. Kennedy Bridge, the Throgs Neck Bridge and the Verrazano-Narrows Bridge.  The toll violation fee shall be in addition to the applicable crossing charge and any fines and penalties otherwise prescribed by law or by agreement.

N.Y. Comp. Codes R. & Regs. tit. 21, § 1021.3

TBM bills. (*Id.* ¶¶ 31, 35.) When Plaintiff received TBM statements, he always paid them on time, but in March 2017 Plaintiff stopped receiving TBM statements. (*Id.* ¶ 36.) Plaintiff contacted EZPass to inquire as to why he was not receiving his statements, and was informed that he should wait as it takes thirty days to prepare the statements. (*Id.*) While waiting for bill statements, Plaintiff began to receive Notice of Violation letters, but paid the amount requested before any violation fees were incurred. (*Id.*) Although Plaintiff never received initial TBM statements, over the course of 2017 Plaintiff continued receiving Notice of Violation letters and also began receiving Enforcement Action letters. (*Id.* ¶ 37.)

Plaintiff attempted to dispute the violation fee charges outlined in the various Enforcement Action letters, and informed EZPass that he was not receiving his initial TBM statements. (*Id.* ¶ 38.) Around November 2017, Plaintiff's online EZPass account was blocked due to a $629.52 outstanding balance. (*Id.* ¶ 39.) On November 14, 2017, Plaintiff paid this balance in full, which closed his EZPass account. (*Id.* ¶¶ 40–41.) In December 2017 and January 2018, Plaintiff continued to receive violation letters almost every week, despite not receiving initial TBM statements. (*Id.* ¶¶ 42–43.) On March 5, 2018, Plaintiff received a collection notice from Transworld System Inc., and reached out to EZPass to dispute the violation fees he received. (*Id.* ¶ 44.) After discussing his problem with EZPass, Plaintiff contacted the local post office and was informed that all his mail was sent to him and that if he was not receiving mail, it was because nothing was sent by EZPass. (*Id.* ¶ 45.) Plaintiff was informed by EZPass that many customers were having issues accessing their bill statements and receiving TBM statements. (Doc. 31, at 2.) Because of his outstanding toll and violation fee balance, in early 2018 Plaintiff's vehicle registration was suspended. (Am. Compl. ¶ 13.) Plaintiff was told on February 27, 2019, after sending various dispute letters to the EZPass

violation processing center, that in order for his vehicle registration suspension to be revoked, he would need to pay the fee balance that was due. (*Id.* ¶¶ 47–52.) Plaintiff continued attempting to dispute his violation fee balance without success. (*Id.* ¶¶ 52–57.) Plaintiff alleges that collection agencies are seeking to collect roughly $61,257.50 in toll bills and violation fees assessed against him as a result of 569 citations from 2017 to March 14, 2018. (*Id.* ¶ 69; Compl. at 1; Doc. 31, Ex. 3, at 65.) From the documentation provided by Plaintiff, it appears that Plaintiff incurred violation fees in the amount of $56,450 for $4,807.50 in underlying tolls. (Doc. 31, Ex. 3, at 65.) Plaintiff appears to have paid $76.50 in violation fees and $1,223.50 in tolls. (*Id.*)

## II.   <u>Procedural History</u>

Plaintiff filed the Complaint in this action on August 13, 2019, (Doc. 2), with leave to proceed in forma pauperis, (Docs. 1, 3). On November 11, 2019, TBTA filed a motion to dismiss for lack of jurisdiction, (Docs. 10–11), which I dismissed as moot after Plaintiff filed an Amended Complaint on December 6, 2019, (Docs. 16–17). On January 10, 2020, TBTA filed a motion to dismiss the Amended Complaint, supported by a memorandum of law and the Declaration of Anne Marie Bressler ("Bressler Decl."), with exhibits. (Docs. 20–22.) On February 10, 2020, Plaintiff filed a memorandum of law in opposition to the motion to dismiss, with exhibits. (Doc. 31.) TBTA filed its reply memorandum of law on February 25, 2020. (Doc. 34.)

On October 1, 2020, I issued an order holding in abeyance Defendant's motion to dismiss because I required supplemental briefing regarding a court proceeding that Plaintiff mentioned in his Amended Complaint and what effect, if any, that would have on Defendant's motion. (Doc. 35.) Defendant issued its supplemental letter in response on December 18, 2020, (Doc. 36), and

Plaintiff issued his response on February 5, 2021, (Doc. 38).

### III.    <u>Legal Standards</u>

#### A.    *Jurisdiction*

"Determining the existence of subject matter jurisdiction is a threshold inquiry[,] and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Morrison v. Nat'l Austl. Bank Ltd*., 547 F.3d 167, 170 (2d Cir. 2008) (internal quotation marks omitted), *aff'd*, 561 U.S. 247 (2010); *United States v. Bond*, 762 F.3d 255, 263 (2d Cir. 2014) (describing subject matter jurisdiction as the "threshold question") (internal quotation marks omitted).  While a district court resolving a motion to dismiss under Rule 12(b)(1) "must take all uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in favor of the party asserting jurisdiction," "where jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits," in which case "the party asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Tandon v. Captain's Cove Marina of Bridgeport, Inc*., 752 F.3d 239, 243 (2d Cir. 2014) (alteration, internal quotation marks, and citation omitted).

#### B.    *12(b)(6)*

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged." *Id.* This standard demands "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Plausibility . . . depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor. *Kassner*, 496 F.3d at 237. "A complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) (internal quotations omitted). A court "may also consider matters of which judicial notice may be taken" in ruling on a motion to dismiss. *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008). A complaint need not make "detailed factual allegations," but it must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). Finally, although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Id.*

Even after *Twombly* and *Iqbal*, a "document filed pro se is to be liberally construed and a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Boykin v. KeyCorp*, 521 F.3d 202, 214 (2d Cir. 2008) (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)). Further, pleadings of a pro se party should be read "to raise the strongest arguments that they suggest." *Brownell v. Krom*, 446 F.3d 305, 310 (2d Cir. 2006) (quoting *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003)). Nevertheless, dismissal of a pro se complaint is appropriate where a plaintiff fails to state a

plausible claim supported by more than conclusory allegations. *See Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013). In other words, "the duty to liberally construe a plaintiff's complaint is not the equivalent of a duty to re-write it." *Geldzahler v. N.Y. Med. Coll.*, 663 F. Supp. 2d 379, 387 (S.D.N.Y. 2009) (internal quotation marks omitted).

## IV. <u>Discussion</u>

I construe Plaintiff's Amended Complaint as raising claims against TBTA under the Eighth Amendment and Fourteenth Amendment, as well as analogous claims under the New York state constitution. Additionally, I construe the Amended Complaint as raising New York common law claims for unjust enrichment, breach of contract, tortious interference with contract, and statutory claims for violations of New York General Business Law ("GBL") sections 349 and 350.

### A. *Abstention Doctrines*

As noted *supra*, on October 1, 2020, I issued an order holding Defendant's motion to dismiss in abeyance pending supplemental briefing. (Doc. 35.) In my order, I noted that Plaintiff's amended complaint indicated that he appeared in court on September 13, 2018 to dispute the toll violation fees at issue here. (*Id.*) (citing Am. Compl. ¶ 46.) I noted that this allegation potentially implicated two prudential abstention doctrines. First, under the *Colorado River* abstention doctrine, "a federal court may abstain from exercising jurisdiction when parallel state-court litigation could result in comprehensive disposition of litigation and abstention would conserve judicial resources." *Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 100 (2d Cir. 2012) (citing *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817–18 (1976)) (internal quotation marks omitted). Second, under the *Younger* doctrine, federal courts generally "abstain from taking jurisdiction over

federal constitutional claims that involve or call into question ongoing state proceedings."

*Diamond "D" Const. Corp. v. McGowan*, 282 F.3d 191, 198 (2d Cir. 2002) (citing *Younger v.*

*Harris*, 401 U.S. 37, 43–44 (1971)).  I asked the parties for more information about the

proceeding—including who brought the claim(s), what claim(s) were brought, the jurisdiction in

which the claim(s) were brought, whether or not the proceeding was ongoing or terminated, and,

if it was terminated, what was the outcome.  (Doc. 35.)

Defendant believes, (Doc. 36), and Plaintiff appears to confirm, (Doc. 38, at 2–3), that

the proceeding at issue was an administrative hearing before the New York State Department of

Motor Vehicles ("NY DMV").  Plaintiff petitioned for the hearing after receiving notification

that the NY DMV intended to suspend Plaintiff's vehicle registration on account of unpaid

monies.  (Doc. 36, at 2.)  The proceeding was fully resolved in favor of Defendant.  (*Id.* at 3.)

Given this, I find that neither the *Colorado River* nor *Younger* abstention doctrines are

applicable to this case.  The administrative proceeding has concluded, meaning that this federal

litigation does not risk coming into conflict with any state proceeding.  At the same time, this

Court is the proper venue for resolving Plaintiff's federal law claims.  As such, abstention is

inappropriate and I will now address Plaintiff's various claims.

## B.    *Excessive Fines*

The Eighth Amendment states "[e]xcessive bail shall not be required, nor excessive fines

imposed, nor cruel and unusual punishments inflicted."  U.S. Const. Amend. VIII.  The

Excessive Fines Clause "'limits the government's power to extract payments, whether in cash or

in kind, as punishment for some offense.'"  *von Hofe v. United States*, 492 F.3d 175, 178 (2d Cir.

2007) (quoting *Austin v. United States*, 509 U.S. 602, 609–10 (1993)).  "The form of the fine is

irrelevant and may be a payment in kind, *i.e.*, a forfeiture, or a payment in cash."  *Id*. at 182.  The

clause's limitations apply to both criminal and civil proceedings, so long as the fines "can be characterized as punitive. . . ." *United States v. Sabhnani*, 599 F.3d 215, 263 n. 19 (2d Cir. 2010). The Supreme Court has held that the Fourteenth Amendment incorporates the Eighth Amendment's prohibition against excessive fines and that it therefore applies to the states. *Timbs v. Indiana*, 139 S. Ct. 682, 689 (2019).

The Second Circuit applies a two-step inquiry to decide "whether a financial penalty is excessive under the Eighth Amendment." *United States v. Viloski*, 814 F.3d 104, 108 (2d Cir. 2016) (citing *United States v. Bajakajian*, 524 U.S. 321 (1998)). "First, a court must consider whether the payment or forfeiture at issue constitutes a 'fine,' meaning that it is punitive in nature and not 'purely remedial.'" *Farina v. Metro. Transportation Auth.*, 409 F. Supp. 3d 173, 194 (S.D.N.Y. 2019) (quoting *Viloski*, 814 F.3d at 109). "Second, a court weighs four factors to determine whether the fine is 'grossly disproportional' to the underlying offense." *Id.* (quoting *Viloski*, 814 F.3d at 110). These factors include: "(1) the essence of the crime of the defendant and its relation to other criminal activity, (2) whether the defendant fits into the class of persons for whom the statute was principally designed, (3) the maximum sentence and fine that could have been imposed, and (4) the nature of the harm caused by the defendant's conduct." *Viloski*, 814 F.3d at 110. "Ultimately, whether a fine is excessive 'involves solely a proportionality determination.'" *Farina*, 409 F. Supp. 3d at 194 (quoting *Viloski*, 814 F.3d 111).[6] "A penalty 'is unconstitutionally excessive if it is grossly disproportional to the gravity of a defendant's offense.'" *Id.* at 199 (quoting *Viloski*, 814 F.3d 111).

---

[6] Although TBTA argues that Plaintiff's excessive fines claim is not yet ripe, TBTA admits in its reply brief that Plaintiff has indeed paid some of the fines due. (Doc. 34, at 2.) In addition, Plaintiff's vehicle registration was suspended in early 2018 and remains suspended, (Am. Compl. ¶ 13), and the documents submitted by TBTA indicate that Plaintiff is subject to tens of thousands of dollars in fines, (Doc. 21-1.) Accordingly, I find Plaintiff's claim ripe for adjudication. *Farina*, 409 F. Supp. 3d at 195 ("Because Farina, Troiano and Ritchie have paid fines for the claimed violations of the cashless tolling system, their claims are ripe for adjudication.").

The fines at issue here are clearly punitive in nature and therefore subject to the Excessive Fines Clause. "[F]ines imposed for violating the cashless-tolling process are punitive in nature, and thus within the scope of the excessive fines clause," because "[c]ivil fines that seek to deter rule-breaking or enforce compliance are punitive in character." *Id.* at 198. TBTA's argument that the violation fees associated with the failure to pay toll bills are merely "in place to secure compliance," (Doc. 22, at 5), is unpersuasive. *Cf. Austin v. United States*, 509 U.S. 602, 610 (1993) ("a civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term.") (quotation marks omitted). In fact, the case TBTA cites in support of this proposition states that "$50 termed a 'violation fee' or potential suspension of vehicle registration for nonpayment of tolls each seems punitive." *Kettle v. N.Y. State Thruway Auth.*, No. 19CV504V, 2019 U.S. Dist. LEXIS 212931, *28 (W.D.N.Y. Dec. 5, 2019) (recommending dismissal of Eighth Amendment claim because "collection efforts are not fines under the [] Excessive Fines Clause" and concluding that plaintiffs' claims were not yet ripe). Nor can it be said that the violation fees are intended only to compensate TBTA for lost revenue given the fact that the fees are many multiples of the actual toll payments due, and often do not vary in relation to the underlying toll amount owed. As Plaintiff's Notice of Violation and Enforcement Action statements indicate, in many instances Plaintiff was assessed $100.00 violation fees for missed toll payments of both $8.50 and $2.00. (*See, e.g.*, Bressler Decl. Ex. 1, at 37.) In other instances, Plaintiff was assessed a $50 violation fee for a missed toll payment of $6.00. (*Id.* at 56.) Overall, Plaintiff owes $56,450 in violation fees for $4,807.50 in underlying tolls. (Doc. 31, Ex. 3, at 65.) Therefore, I find that Plaintiff has plausibly alleged that the fines at issue are not "purely remedial," *Viloski*, 814 F.3d at 109 n.7, and are thus subject

to the Excessive Fines Clause.

I also find Plaintiff's alleged fines are grossly disproportional to his alleged conduct. The first factor weighs in Plaintiff's favor, because "[t]here is no indication that [Plaintiff's] fines were paid to address any civil or criminal violations beyond a purportedly underfunded E-Z Pass account, or that [Plaintiff's] conduct threatened public safety." *Farina*, 409 F. Supp. 3d at 202. In other words, Plaintiff's "violation [is] unrelated to any other illegal activities." *Bajakajian*, 524 U.S. at 337–38. The second factor weighs in Defendant's favor, given that Plaintiff "is a vehicle owner who used the TBTA's infrastructure for which a toll is due." *Farina*, 409 F. Supp. 3d at 202.

With regard to the third factor, nearly all of the fines charged to Plaintiff were for $100, (Doc. 31, Ex. 3), which is the maximum amount provided for in the statute, N.Y. Comp. Codes R. & Regs. tit. 21, § 1021.3. Defendant notes that Plaintiff has never paid the full amount for any of these fines and points to the reasoning in *Farina*, in which the Court analyzed this factor by determining that the relevant plaintiff had "*paid* the maximum possible fine." *Farina*, 409 F. Supp. 3d at 202 (emphasis added). However, the plain language set out in *Bajakajian* requires that I examine the maximum possible fine that "could have been *imposed*," 524 U.S. at 338 (emphasis added), without regard to how much Plaintiff has actually paid. *See also Kettle*, 2019 U.S. Dist. LEXIS 212931, at *36 (W.D.N.Y. Dec. 5, 2019) (assessing the third factor based on the maximum possible on the fine charged, not what is paid). Defendant's observation that some of Plaintiff's fees have been waived, (Doc. 34, at 2), is similarly irrelevant because it does not change the fact that Plaintiff has tens of thousands of violation fees still outstanding, most of which were issued at the statutory maximum of $100.

The final factor also weighs in Plaintiff's favor. Defendant is correct that it "uses surplus toll revenue to support public transportation." (Doc. 22, at 11.) Beyond that, however, Defendant's identified harms are either abstract or far-fetched. Defendant cannot point to anything tangible to suggest that Plaintiff's failure to pay—which the Amended Complaint alleges was not willful but was instead caused by Plaintiff suddenly not receiving TBM statements—actually "encourage[d] others to evade tolls" or "harm[ed] the integrity of TBTA's tolling system." (*Id.*) Plaintiff's harm caused here was "minimal," as it "affected only one party, the Government, and in a relatively minor way." *Bajakajian*, 524 U.S. at 339.

I note that the *Bajakajian* factors are not necessarily "exhaustive," nor does the Supreme Court prescribe a "rigid test" in applying them. *Viloski*, 814 F.3d at 110. In particular, the Second Circuit determined that it is often "especially important" to consider also "whether the forfeiture would deprive the defendant of his livelihood, i.e., his future ability to earn a living." *Id.* at 111 (internal quotation marks omitted). The Second Circuit has noted that "courts need not consider this fifth factor in all cases," and that if they do, "courts may not consider as a discrete factor a defendant's personal circumstances, such as age, health, or present financial condition." *Id.* at 112; *but see United States v. Muzaffar*, 714 Fed. App'x 52, 58 (2d Cir. 2017) (analyzing plaintiff's education levels and employment history when evaluating his future ability to earn a living). Here, Plaintiff's Amended Complaint alleges that the violation fees at least partially contributed Plaintiff having his online EZPass account blocked and his vehicle registration suspended, (Am. Compl. ¶¶ 13, 38)—both of which would impede any contracted driver's future ability to earn a living. Further, even ignoring Plaintiff's particular financial situation, charging most individuals with more than $56,000 in violation fees would deprive them of their future ability to earn a living in large part because it is "extremely unlikely that [they] would be able to

13

pay the judgment over the course of [their] lifetime." *United States v. Duncan*, No. 18-Cr-289

(SHS), 2020 WL 4345730, at *4 (S.D.N.Y. July 29, 2020).

That said, few courts have examined this potential fifth factor, and it is not determinative

in my analysis. Plaintiff has been assessed tens of thousands of dollars in violation fees, in large

part because the maximum $100 violation fee—which Plaintiff was almost always charged—is

at minimum more than eleven times greater than the underlying toll. Even just taking the first

four *Bajakajian* factors together, I find that Plaintiff has plausibly alleged that his assessed fines

are grossly disproportional to his alleged conduct. Because of this, I also exercise supplemental

jurisdiction over Plaintiff's excessive fines claim under Art. I, Sec. V of the New York

Constitution. *See* 28 U.S.C. § 1367(a).

### C. *Procedural Due Process*

The Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life,

liberty, or property without due process of law." U.S. Const. amend. XIV. "A procedural due

process claim is composed of two elements: (1) the existence of a property or liberty interest

that was deprived and (2) deprivation of that interest without due process." *Bryant v. N.Y.S.*

*Educ. Dep't*, 692 F.3d 202, 218 (2d Cir. 2012). "An essential principle of due process is that a

deprivation of life, liberty or property 'be preceded by notice and opportunity for hearing.'"

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (quoting *Mullane v. Central*

*Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950)).

Due process requires that the government provide "notice reasonably calculated, under all

the circumstances, to apprise interested parties of the pendency of the action and afford them an

opportunity to present their objections." *Jones v. Flowers*, 547 U.S. 220, 226 (2006) (quoting

Mullane, 339 U.S. at 314). In analyzing whether the notice is adequate, courts focus "on the

reasonableness of the chosen means, not whether the affected persons actually received notice."
*Brody v. Vill. of Port Chester*, 434 F.3d 121, 127 (2d Cir. 2005) (citing *Weigner v. City of N.Y.*,
852 F.2d 646, 649 (2d Cir. 1988)).  Although "due process does not require actual notice, actual
notice satisfies due process" if it "apprises [a party] of the pendency of the action and affords an
opportunity to respond."  *Oneida Indian Nation of N.Y. v. Madison County*, 665 F.3d 408, 429
(2d Cir. 2011) (quoting *Baker v. Latham Sparrowbush Assoc.*, 72 F.3d 246, 254 (2d Cir. 1995)).
Due process also does not impose a "rigid requirement as to the precise timing with which notice
must be given."  *Id.* at 434.

Whether a pre-deprivation opportunity to be heard is constitutionally sufficient,
regardless of the post-deprivation process afforded, depends on balancing the following:  (1) the
nature of the private interest that will be affected by the official action; (2) the risk of an
erroneous deprivation of such interest through the procedures used, and the probable value, if
any, of additional or substitute procedural safeguards; and (3) the Government's interest,
including the function involved and the fiscal and administrative burdens that the additional or
substitute procedural requirement would entail.  *See Walter v. Queens Coll.*, 390 F. Supp. 3d
382, 399 (E.D.N.Y. 2019) (citing *Mathews v. Eldridge*, 424 U.S. 319, 355 (1976)).  An
opportunity to be heard must be "at a meaningful time and in a meaningful manner."  *First Nat.
Acceptance Co. v. City of Utica, N.Y.*, 26 F. Supp. 3d 185, 195 (N.D.N.Y. 2014) (quoting
*Karpova v. Snow*, 497 F.3d 262, 270 (2d Cir. 2007)).

As to the first issue, there is no question that Plaintiff has been deprived of property
interests here.  Plaintiff has a cognizable property interest not just in the violation fees he has
paid, but the tens of thousands of dollars in violation fees he has been assessed.  *See Farina*, 409
F. Supp. 3d at 206.  Further, Plaintiff alleges that his vehicle registration has been suspended

since early 2018 on account of these outstanding violation fees.  (Am. Compl. ¶ 13).  "[A] driver's license is a property interest that may not be suspended or revoked without due process." *Perry v. McDonald*, 280 F.3d 159, 174 (2d Cir. 2001) (internal quotation marks omitted); *see also McGuire v. City of N.Y.*, 142 Fed. App'x 1, 3–4 (2d Cir. 2005) ("The law recognizes issued driver's licenses to constitute a property interest that cannot be suspended without the procedural due process protection of adequate notice.") (citing *Bell v. Burson*, 402 U.S. 535, 539 (1971)). Given that Plaintiff is a professional driver, the suspension of his vehicle registration is substantially similar to the suspension of his driver's license, because both would equally prevent him from doing his job and earning a living.

However, Plaintiff's due process claims cannot proceed because it is clear that he had sufficient "actual notice."  *See Oneida Indian Nation*, 665 F.3d at 429.  Plaintiff makes clear that although he stopped receiving TBM statements around March 2017, he received a steady stream of violation notices notifying him both of the toll fees he incurred and the potential violation fees if he did not pay in a timely manner.  (Am. Compl. ¶¶ 35–38.)  Plaintiff alleges that he was receiving violation letters "almost every week" by the end of 2017 and the beginning of 2018. (*Id.* ¶¶ 42–43.)  These violation letters detailed the specific tolls and violation fees at issue, instructed Plaintiff that "[f]ailure to respond to this Notice of Violation in a timely manner may result in the imposition of an administrative violation fee of up to $100 per unpaid Toll, referral to a collection agency, additional fees and charges and/or suspension of your vehicle registration," and, crucially, provided Plaintiff with instructions and a mechanism to dispute the violations. (*See, e.g.*, Doc. 21-1, at 86–87.)  As such, Plaintiff was provided actual notice that failure to respond or pay would result in the imposition of violation fines of up to $100 and offered him an opportunity to be heard to dispute these charges.  This is fatal both to Plaintiff's

federal and state constitutional due process claims.[7]  *See generally Matter of Cty. of Seneca*, 151

A.D.3d 1611, 1611–12 (4th Dep't 2017) ("Due process does not require that a property owner

receive actual notice before the government may take his or her property.") (internal quotation

marks omitted).

### D.   *Unjust Enrichment*

"The basic elements of an unjust enrichment claim in New York require proof that (1)

defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate

against permitting defendant to retain what plaintiff is seeking to recover."  *Grynberg v. ENI*

*S.P.A.*, 503 Fed. App'x 42, 43 (2d Cir. 2012) (summary order) (quoting *Briarpatch Ltd., L.P. v.*

*Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004)).  "[T]he essential inquiry in any action

for unjust enrichment or restitution is whether it is against equity and good conscience to permit

the defendant to retain what is sought to be recovered."  *Sperry v. Crompton Corp.*, 8 N.Y.3d

204, 215 (2007) (internal quotation marks omitted).

The first two elements are plain enough—Plaintiff has paid at least some violation fees,

meaning that Defendant has been enriched at Plaintiff's expense, even if Plaintiff has paid only a

fraction of the fees assessed to him.  (Doc. 31, Ex. 3, at 65.)  With regard to the third element,

Plaintiff plausibly alleges that the violation fees he has incurred—including the violation fees he

has paid so far—were not a result of his own negligence or fault but rather Defendant's failure to

provide proper and timely balance statements.  Put simply, Plaintiff's factual allegations—taken

as true for purposes of this motion—indicate that an "injustice . . . [may have been] perpetrated

on" him.  *N. Am. Foreign Trading Corp. v. Chiao Tung Bank*, No. 95 Civ. 5189(LBS), 1997 WL

193197, at *9 (S.D.N.Y. Apr. 18, 1997).  The Amended Complaint suggests that this is not an

---

[7] Here, it also appears that Plaintiff in fact was heard since he appeared for an administrative hearing before the NY DMV.  (*See* Docs. 36, 38.)

instance where Plaintiff failed to "exercise caution with respect to a business transaction" and now attempts to "change the rules of the game after the game has been played," *Tasini v. AOL, Inc.*, 851 F. Supp. 2d 734, 741 (S.D.N.Y. 2012); to the contrary, Plaintiff plausibly alleges that he was assessed violation fees and paid some of them at least in part because he was not provided timely documentation.

Defendant makes several arguments in support of its motion to dismiss Plaintiff's unjust enrichment claim, none of which succeed at this stage. First, Defendant argues that "conduct sanctioned by law cannot be the subject of an unjust enrichment claim." (Doc. 22, at 16–17); (*see also* Doc. 34, at 5) ("Any violation fees paid cannot be subject to an unjust enrichment claim because they are lawful"). This is untrue; in *Farina*, for example, the court determined that one of the plaintiff's unjust enrichment claims should survive a motion to dismiss when that plaintiff had paid the same violation fees at issue here. *Farina*, 409 F. Supp. 3d at 218–20. Under Defendant's interpretation, unjust enrichment claims would be valid only if the conduct at issue was already independently unlawful—a reading that would render any unjust enrichment claims duplicative and essentially meaningless. Second, Defendant argues that Plaintiff's unjust enrichment claim is duplicative of his claims for tortious interference with contract and under GBL §§ 349–50. As I will explain *infra*, I am dismissing both of these other claims, so even assuming Defendant is correct, that issue is moot. Third, Defendant argues that Plaintiff "does not allege making any payments under protest." (Doc. 22, at 17.) In *Farina*, the Court determined that it was sufficient for the plaintiff to allege that "she repeatedly contacted EZ-Pass customer service in an attempt to understand the basis for the fines demanded of her, and that she has repeatedly disputed the outstanding, improper charges." *Farina*, 409 F. Supp. 3d at 219. The same is true here: Plaintiff alleges sending EZPass several dispute letters, appearing an

administrative hearing, and contacting EZPass and his local post office on many occasions. (*See* Am. Compl. ¶¶ 38–57.) Fourth, Defendant notes that Plaintiff's violation fees that have been paid are a fraction of what he owes in outstanding violation fees and tolls. (Doc. 34, at 5.) This argument is not only immaterial to Plaintiff's unjust enrichment claim at issue here, but would also punish Plaintiff and others who do not have sufficient funds to pay significant amounts of their outstanding violation fees.

Accordingly, I find that Plaintiff has satisfied his burden at the motion-to-dismiss stage with regard to his unjust enrichment claim.

### E.     *GBL §§ 349–50*

New York GBL § 349 declares unlawful "[d]eceptive acts or practices in the conduct of any business trade or commerce or in the furnishing of any service," while New York GBL § 350 renders unlawful "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service." "The elements of a cause of action under these statutes are that: (1) the challenged transaction was consumer-oriented; (2) defendant engaged in deceptive or materially misleading acts or practices; and (3) plaintiff was injured by reason of defendant's deceptive or misleading conduct. Thus, a plaintiff claiming the benefit of these statutes must allege conduct that is consumer oriented." *Denenberg v. Rosen*, 71 A.D.3d 187, 194 (1st Dep't 2010) (internal quotation marks omitted).

"In New York law, the term 'consumer' is consistently associated with an individual or natural person who purchases goods, services or property primarily for personal, family or household purposes." *Cruz v. NYNEX Info. Res.*, 263 A.D.2d 285, 289 (1st Dep't 2000) (internal quotation marks omitted). In *Kinkopf v. TBTA*, the Appellate Term determined that tolls collected by the government "are in essence a use tax," meaning that "the collection of same is

not a consumer oriented transaction and therefore not subject to section 349 of the General

Business Law."  6 Misc. 3d 73, 74 (N.Y. App. Term 2004).  "The holding of an intermediate

appellate state court . . . is a datum for ascertaining state law which is not to be disregarded by a

federal court unless it is convinced by other persuasive data that the highest court of the state

would decide otherwise."  *Michalski v. Home Depot, Inc.*, 225 F.3d 113, 116 (2d Cir. 2000).  I

have no such information that would lead me to believe that the New York Court of Appeals

would feel differently, and therefore it would be inappropriate for me, as a federal judge, to

second-guess a state court on an interpretation of state law.  Because the factual allegations at

issue here do not concern any consumer-oriented activities, Plaintiff's GBL claims are dismissed.

### F.    *Breach of Contract and Tortious Interference with Contract*

While Plaintiff's unjust enrichment is a "quasi-contract claim" that can create an

obligation "in the absence of any agreement," *Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue

Shield of N.J., Inc.*, 448 F.3d 573, 586 (2d Cir. 2006) (internal quotation marks omitted), Plaintiff

brings two other common law claims that rely on the existence of a contract:  breach of contract

and tortious interference with contract.

The elements of breach of contract under New York law are well established:  "(1) the

existence of a contract between [the plaintiff] and th[e] defendant; (2) performance of the

plaintiff's obligations under the contract; (3) breach of the contract by th[e] defendant; and (4)

damages to the plaintiff caused by th[e] defendant's breach."  *Diesel Props. S.r.l. v. Greystone

Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011).  "A claim of tortious interference requires

proof of (1) the existence of a valid contract between plaintiff and a third party; (2) the

defendant's knowledge of that contract; (3) the defendant's intentional procuring of the breach,

and (4) damages."  *Foster v. Churchill*, 87 N.Y.2d 744, 749–50 (1996); *see also Kirch v. Liberty

*Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006). "A tortious interference claim requires a breach of the contract between the plaintiff and the third party." *Cap. Access Servs. Inc. v. Direct Source Seafood, LLC*, No. 17-CV-1405 (VSB), 2018 WL 3093967, at *7 (S.D.N.Y. June 22, 2018), *aff'd*, 767 F. App'x 157 (2d Cir. 2019). "To impose liability, a defendant must induce or intentionally procure a third-party's breach of its contract with the plaintiff and not merely have knowledge of its existence." *Beecher v. Feldstein*, 8 A.D.3d 597, 598 (2d Dep't 2004).

Plaintiff's Amended Complaint is somewhat unclear, but I interpret Plaintiff as alleging his contract claims based on the agreement he entered into with EZPass when he purchased an EZPass tag in 2017. (Am. Compl. ¶ 35); (*see also* Doc. 31, Ex. 1). Plaintiff's theory under these two claims is that Defendant has interfered with Plaintiff's contract because the contract does not permit Defendant to "charge excessive and unreasonable administrative fees and civil penalties" and otherwise interfere with Plaintiff's benefits. (Am. Compl. ¶¶ 97–98.)

Regardless of the precise contract at issue, Plaintiff's claims must fail because, as Defendant rightly notes, "Plaintiff's obligation to pay tolls (and fees for violations) arises out of statutory and regulatory law." (Doc. 22, at 20.) Plaintiff, like all other drivers on New York State roads, is required to pay the tolls and fees that are codified in state statutes and regulations, and whose amounts cannot be changed or circumvented by contract. *See, e.g.*, 21 NYCRR § 1021.1 (setting out standardized toll rates); 21 NYCRR § 1021.3(b) (setting out standardized violation fees). In this way, "it is of no moment that Plaintiff had an Agreement with E-ZPass . . . since that Agreement is not the source of the obligation." *St. Pierre v. Retrieval-Masters Creditors Bureau*, No. 15–2596 (FLW)(DEA), 2017 WL 1102635, at *10 (D.N.J. Mar. 24, 2017); *see also Blandford Land Clearing Corp. v. Nat'l Union Fire Ins. Co.*, 260 A.D.2d 86, 94 (1st Dep't 1999) (declining to find contractual relationship where there is an "independent

obligation imposed by operation of law"). EZPass was just a tool created to assist drivers on New York State roads to pay the required tolls and fees under the state statutes and regulations. Plaintiff cannot properly allege an injury traceable to any potential contract at issue here.

### V.    Conclusion

For the foregoing reasons, TBTA's motion to dismiss, (Doc. 20), is DENIED with respect to Plaintiff's federal and state Excessive Fines Claims and Plaintiff's unjust enrichment claim. TBTA's motion to dismiss is GRANTED as to all other claims.

Defendant is directed to file an answer to Plaintiff's First Amended Complaint within fourteen (14) days of the filing of this Opinion & Order.

The Clerk is directed to mail a copy of this Opinion & Order to the pro se Plaintiff. The Clerk is also directed to terminate the open motion at Document 20.

SO ORDERED.

Dated: June 23, 2021
    New York, New York

_____
    Vernon S. Broderick
    United States District Judge